1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

7

**DISTRICT OF NEVADA**

8   PATRICK H. MCGUIRE and LISA
    ANNE MCGUIRE,
9
10              Plaintiffs,                    Case No. 3:20-cv-00249-RCJ-CLB

11   vs.                                       **ORDER**

12   ANNE MARIE CAREY, et al.,

13              Defendants.

14          Plaintiffs request a preliminary injunction enjoining Defendants City of Reno and Joseph

15   Henry (collectively referred to as "the City") from enforcing administrative penalties in response

16   to alleged zoning ordinance violations. On July 28, 2020, the Court held a hearing and granted a

17   temporary restraining order (TRO) until August 17, 2020 to allow for additional briefings, limited

18   discovery, and a subsequent hearing. At this later hearing, the City stipulated not to pursue any

19   enforcement actions against Plaintiffs, except to record a notice of these violations.[1] For this

20   reason, the Court denies the motion.

21

22   [1] According to this stipulation, the City will not seek any enforcement action against Plaintiffs
     based on the current alleged zoning ordinance violations other than recording a notice of
23   violation—unless and until these alleged violations present a safety issue. If such a circumstance
     arises, the City agreed to present such an issue and to seek leave from this Court before pursuing
24   further enforcement actions. As the City makes this concession, the Court interprets the motion for
     a preliminary injunction to merely seek to enjoin the recordation.

# BACKGROUND

Defendant Carey Trust, through its trustee Defendant Carey, purchased the property located at 1640 Watt St., Reno, Nevada 89509 (the Property) in 2007. (ECF No. 45 ¶ 3.) At the time of this sale, the Property was listed as having four bedrooms on the Northern Nevada Regional Multiple Listings Service (MLS), and the Washoe County Assessor's Office taxed the Property as a four-bedroom home. (*Id.* ¶ 26.)

In 2010, Defendant Carey sought to make improvements to the Property. (*Id.* ¶ 5.) Initially, Defendant Carey began this work without a permit. (ECF No. 69 Ex. 1 ¶¶ 4–6.) After threatened enforcement actions, (*see* ECF No. 69 Exs. 1-A to 1-E), Defendant Carey applied for permits with the City, (*see id.* ¶ 6). Initially, Defendant Carey acquired a permit prior to the one at issue to allow for this remodel. (ECF No. 69 Ex. 1-D.) That permit was "Permit BLD10-04273" and listed the general contractor as "All Quality Builders." (*Id.*) Defendant Carey claimed to have become dissatisfied with delays from this contractor and applied for the permit at issue, with the intent to complete the work herself without a general contractor. (*See* ECF No. 68 Ex. 37 at 5.) This new permit application listed "Anne Marie Carey" as the "Owner" and "Owner Builder" as the "General Contractor," (ECF No. 69 Ex. 1-F), which the City approved as "Permit BLD11-03170" (the Permit) to make the modifications to the Property in February 2011, (ECF No. 69 Ex. 1-G).

From around that time until May 2019, the City's website listed the Permit as "Active/Permit Issued," (*see* ECF No. 17 Ex. 14). Other permits relevant to the Property were listed as "Expired," "Cancelled," or "Closed," (*see* ECF No. 17 Ex. 12). The website also notes that the plans for the Permit were "Approved w/ Redlines" by Ms. Daniela Monteiro on February 17 or 22, 2011 (the website lists the 17th as a "Sent Date" and the 22nd as a "Returned Date"). (*See* ECF No. 17 Ex. 14.) Next to "Approved w/ Redlines," there is a note, which states, "This ///

residence is restricted to 2 bedrooms based on the available parking on this site. Builder and owners are aware of this restriction." (*See id.*)

The Permit itself notes that its issuance is not final approval of the work to be completed but merely permission "to execute the work described in th[e] application." (ECF No. 69 Ex. 2-D.) It further states that "ALL INSPECTIONS MUST BE COMPLETED" and that "[i]t is unlawful to remove this record from the job site *until all final inspections have been made.*" (*Id.* (emphasis added).) Lastly, it contains the following language, "[T]his permit shall expire if work is not commenced within 180 days from the issue date or if work is suspended or abandoned at any time after the work is commenced for a period of 180 days." (*Id.*) Approved plans for the Property contain an annotation, which reads, "This residence is restricted to 2 bedrooms based on available parking. DBM 02/22/11." (ECF No. 69 Ex. 2-E.)

The Permit lists the inspections that must be completed to finalize the construction:

- B406 Stemwall
- B433 Floor Joist
- B460 Insulation
- B463 Sheetrock
- B552 Electrical Rough
- B537 Mechanical Rough
- B640 Mechanical Top Out
- B504 Plumbing Rough
- B540 Plumbing Top Out
- B567 Final Grading Letter
- B570 Letter: Soils/Compactions/Setbk
- B585 Residential Building Final
- B637 1704 Special Insp Final Report
- B436 Frame

(ECF No. 69 Ex. 2-D.)

///

///

///

Of this list, the City admits that Defendant Carey completed and passed half, including the following:

- B504 Plumbing Rough
- B406 Stemwall
- B433 Floor Joist
- B552 Electrical Rough
- B537 Mechanical Rough
- B436 Frame
- B463 Sheetrock

(ECF No. 67 Ex. 2 at 4; *see* ECF No. 68 Exs. 15–16 (noting completion of these inspections).) In her declaration, Defendant Carey does not contend to have completed more inspections. (*See* ECF No. 45 ¶¶ 8–9 (listing the same completed inspections).)[2] The City's agent, Mr. Chris Pingree, swears, "According to [the City's] permit records I reviewed for the [Permit] issued to [Defendant] Carey in 2011, seven open inspections were still remaining after the last (drywall) inspection was completed in March 2011." (ECF No. 69 Ex. 2 ¶ 4.)

In its supplemental brief, Defendant Carey attached an exhibit titled, "ENF12-C00042 Workflow History." (ECF No. 68 Ex 23.) This document indicates that the City performed an investigation of the Property in July 2011. (ECF No. 68 Ex 23.) The document further indicated that Defendant Henry initiated the investigation, but Ms. Cynthia Gil-Blanco conducted it. Defendant Carey points to a statement dated July 8, 2011 by Ms. Gil-Blanco, which reads, "'Active' building permit, BLD11-03170 remodel/addition, however, last inspection was 3/17/2011." (*Id.*) Ms. Gil-Blanco also noted that there were "a few bags of dry cement mixture and a trash can and bucket and broom and shovel possibly to complete the unfinished paver project out

---

[2] In her own answer to one of the City's interrogatories, Defendant Carey claims that an agent for the City, Mr. William Kennedy, inspected the property and that "he indicated everything had been signed off and passed and that there was no further action required by me [(i.e., Defendant Carey)]." (ECF No. 68 Ex. 37 at 4–5.)

in front." (*Id.*) She lastly notes on July 15 that she had a phone call with Defendant Carey, who explained that the materials were to complete the "stone paver project in the front yard." (*Id.*) On the same day, Ms. Gil-Blanco concluded that there was currently "no violation" and closed the case. (*Id.*) In her interrogatory response, Defendant Carey identified this exhibit as a "document that . . . support[s her] claims against the City." (ECF No. 69 Ex. 37 at 3.)

The City did not take any further action regarding the Property or Permit between July 2011 and April 2019. (*See* ECF No. 17 Ex. 14 (failing to record any action regarding the Permit between February 2019 and April 19, 2019.)

In 2019, Defendant Carey listed the Property for sale as a four- or five-bedroom residence, (*compare* ECF No. 17 Ex. 1 at 1 (indicating five bedrooms), *with id.* at 4 (indicating four bedrooms), and Plaintiffs became interested in purchasing it. Plaintiffs are a married couple, (ECF No. 17 ¶ 1), who reside in California, (ECF 67 ¶ 11). On April 3, 2019, Plaintiffs contracted to purchase the Property from Defendant Carey for $615,000. (ECF No. 17 Ex. 6.) This began the escrow period, which ended upon closing on or about May 10, 2019. (ECF No. 17 ¶ 8.)

During the course of escrow, Plaintiffs' real estate agent allegedly "pulled the permit history for the [Property] from Defendant City of Reno's website on April 13, 2019," which showed "[the Permit] under the Status Section [was] 'Active/Permit Issued.'" (ECF No. 17 ¶ 6.)

On April 19, 2019, the City received a citizen complaint about the Property. (ECF No. 69 Ex. 1 ¶ 4.) Based on the complaint and investigation of the record, it issued a "Notice of Violation" to Defendant Carey indicating that the Permit would expire two weeks after that date because she had failed to comply with inspection requirements and for other defects. (*Id.* ¶ 10; *see* ECF No. 17 Ex. 8.) Specifically, the letter identified as deficiencies "the last inspection being a sheetrock inspection on March 17, 2011," and violation of zoning restrictions as "MLS listings show the house is selling as a 5 bedroom, the approved building permit for this addition restricted the total

number of bedrooms for the house to 2 bedrooms." (ECF No. 17 Ex. 8.) Defendant Carey swears that she was unaware of these alleged defects until she received this notice on April 24, 2019. (ECF No. 45 ¶¶ 12–13.) Because of these alleged defects, the City claimed that Defendant Carey was in violation of Reno Municipal Code (RMC) § 8.22.090. (*Id.*) According to the City, "All necessary permits must be secured and completed to correct the violations set forth in this notice." (*Id.*) A second notice was sent to the Property on May 10, 2019 and was signed for by the occupant on May 14, 2019. (ECF No. 69 Ex. 1 ¶ 19.) At the August 17 hearing, Plaintiffs and Defendant Carey indicated that a tenant of Defendant Carey's occupied the Property at this time.

In his affidavit, Defendant Henry swears to the following: While he was aware that the Property was for sale when the April 19 letter was sent, he did not know that there was already a contract for the Property's sale as nothing was yet publicly recorded. (*Id.* ¶ 12.) He became aware of the sale when he was contacted again by the citizen complainant on May 14, 2019. (*Id.* ¶ 20.) That same day, he called Plaintiffs' real estate agent, Mr. Jonathan Wornardt, informing him of the zoning violations, and Mr. Wornardt stated that he would inform the Plaintiffs. (*Id.* ¶ 20.)

Plaintiffs, however, assert that they did not learn of this issue until the City emailed them in July, (ECF No. 17 Ex. 11), regarding the alleged violations. After some email correspondence between the City and Plaintiffs regarding the Property, the City then issued a similar "Notice of Violation" on August 28, 2019 addressed to Plaintiffs. (ECF No. 17 Ex. 15.) In this notice, the City claims that Plaintiffs are in violation of International Residential Code (IRC) § R105.1, International Property Maintenance Code (IPMC) § 108.1.4, and RMC § 8.22.090. (*Id.*) It further claims:

> [THE PROPERTY] IS AN UNLAWFUL STRUCTURE AS THE ORIGINAL BUILIDING [sic] PERMIT ISSUED FOR THE ADDITION EXPIRED WITHOUT THE REQUIRED INSPECTIONS AND ADDITIONAL MODIFICATIONS TO THE APPROVED PLANS WERE MADE WITHOUT THE REQUIRED REVISIONS TO THE BUILDING PERMIT. THE ADDITION

TO THE HOUSE AT 1640 WATT STREET WAS ORIGINALLY APPROVED UNDER BUILDING PERMIT BLD11-03170. THE BUILDING PERMIT HAS EXPIRED AND IS NO LONGER VALID.

(*Id.* (emphasis in original).)

To come into compliance, the City demanded Plaintiffs have a licensed contractor obtain a new building permit by September 30, 2019. (*Id.*) Otherwise, it stated, "Failure to correct the violation(s) can lead to further administrative actions such as the remedies detailed in Chapter 1.05 of the [RMC] or criminal prosecution as a misdemeanor with a maximum penalty of six months in jail and $1000.00 fine." (*Id.*) The City also explained that Plaintiffs could administratively appeal the citation with the Reno City Clerk's Office within ten business days from the date of the citation. (*Id.*)

Initially, Plaintiffs did not challenge this notice, through appeal or otherwise but instead attempted to work towards compliance. In a subsequent letter, the City acknowledged that Plaintiffs "expressed an intent to comply with the corrective actions." (ECF No. 19 Ex. 3.) Plaintiffs confirm this original intention in their Second Amended Complaint. (ECF No. 17 ¶ 62.)

Plaintiffs however further allege that they were unable to come into compliance because "the City continues to press its abusive and constitutionally unjustifiable positions," (ECF No. 17 ¶ 118), and swear by affidavit that they received conflicting orders from the City, (ECF No. 44). Initially, the City indicated that coming into compliance "would cost $1500 as long as [there was] not too much change from the original permit." (*Id.* ¶ 9.) They claim that the City later stated that the Property "could only be a 2-bedroom house because of parking and that the house envelop[e] was too large," (*Id.* ¶ 18), even though the City's agents also "said the plans looked good . . . because the 'as built' plans showed no changes from the 'as permitted' [plans]." (*Id.* ¶ 16.)

In April 2020, they filed suit against the City (among others). Plaintiffs contend that the City, through its attempt to enforce the zoning ordinances against them, is violating their Eighth

Amendment right to be free from cruel and unusual punishment and their Fourteenth Amendment rights to procedural and substantive due process.

On June 22, 2020, Plaintiffs (through counsel) wrote a letter to the City requesting that it rescind the notice of violation and issue a formal letter that would clear the residence of any and all permitting issues. (ECF No. 19 Ex. 2.) In their letter, Plaintiffs further requested the City indicate its position on whether any amount of fines were outstanding, whether fines are currently accruing, and the maximum amount of imprisonment to which Plaintiffs are subject, if any. (*Id.*) Three days later, the City responded, stating that there were no outstanding fines because of Plaintiffs' previous attempt to comply but declining to rescind its notice of violation. (ECF No. 19 Ex. 3.) The City also argued that Plaintiffs have not exhausted their claims because they did not appeal the notice of violation, and any appeal would now be untimely. (*Id.*)

On June 29, 2020, the City sent Plaintiffs a document titled "Notice of Intent to Record Notice of Violation." (ECF No. 19 Ex. 1.) This notice reiterates the alleged violations and states, "Pursuant to [RMC §] 1.05.105 a Notice of Violation will be filed with the Washoe County Recorder's Office if the violations are not corrected within ten (10) business days." (*Id.*) This action will place a Notice of Violation on the Property that gives public notice of the alleged zoning ordinance violation. *See* RMC § 1.05.105. ("Recording notices of violation; purpose. The council finds that there is a need to give notice of pending enforcement actions to persons who may subsequently acquire property subject to a violation as a means to ensure the violations will be corrected. An appropriate method to accomplish this is through the issuance and recording of notices of violation.").

On July 13, 2020, the Court declined to issue a TRO, finding the arguments Plaintiffs raised in the motion deficient. (ECF No. 29.) Shortly thereafter, Plaintiffs filed an administrative appeal with the Reno City Clerk's Office in regard to the June 29 notice. (ECF No. 33 Ex. 1.) A hearing

for this appeal took place before an Administrative Hearing Officer on August 18, 2020, (*id.*), but the parties have not, as of this Order, provided the Court with the results of that hearing, if any.

In their reply brief, Plaintiffs raised two new theories they argue support issuance of a preliminary injunction: laches and vindictive enforcement. (ECF No. 37.) For their laches argument, Plaintiffs rely on essentially the same facts as those presented in the original motion but presented new evidence to support their allegation of vindictive enforcement. This new evidence consisted of an ethics complaint that AMCB, LLC (d/b/a "Rubbish Runners") issued against City of Reno Sustainability Manager Lynne Barker in or around February 2017. Plaintiffs claim that Defendant Carey owns this company and that the complaint generated personal animus against Defendant Carey, resulting in the instant enforcement actions. Plaintiffs argued that this animus is why the City is pursuing the action now.

At the July 27, 2020, hearing on the request for a preliminary injunction, the Court determined that additional briefing and limited discovery on the issue of whether a preliminary injunction is proper in this case was required, and therefore granted a TRO until August 17, 2020. (ECF Nos. 57–58.)[3] The Court noted that Plaintiffs might have a claim under procedural due process because the City revoked the permit without providing adequate procedures. (ECF No. 56.) Plaintiffs, Defendant Carey, and the City have completed their limited discovery, and each submitted a supplemental brief.

On August 17, 2020, the Court held a second hearing on the request for a preliminary injunction. During this hearing, the City made its stipulation to not pursue any further action except to record the Notice of Violation without leave of this Court.

///

---

[3] All parties consented to the extension past the TRO's normal fourteen-day limit. (ECF No. 58 at 2:17–26.)

**LEGAL STANDARD**

A court should grant a preliminary injunction where the moving party "establish[es] that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). If the moving party can only establish "serious questions going to the merits," he can still succeed by showing that the remaining three factors weigh towards granting the injunction and the balance of hardships "tips sharply" in that direction. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

**ANALYSIS**

With the City's concession that it will not pursue any action beyond recording the Notice of Violation, the Court finds that Plaintiffs cannot satisfy the required showing that they will be irreparably harmed absent the proposed injunction, that the balance of hardships tips in their favor, and that such an injunction is in the public interest. Based on these failures, the Court denies the motion. The Court will address each element in turn.[4]

First, Plaintiffs will experience no harm from the recordation itself. Inasmuch as the alleged defects are not already reasonably discoverable by a potential buyer, Plaintiffs would have a duty to disclose the alleged ordinance violations to any potential buyers even if they sold it "as is." *See, e.g.*, *Mackintosh v. Jack Matthews & Co.*, 855 P.2d 549, 552 (Nev. 1993). Consequently, the notice does nothing but alert potential buyers of the Property that the City contends it to be in violation of the zoning ordinances—a contention that Plaintiffs are free to challenge in this forum but must still disclose to any potential buyers.[5] To be clear, the Court takes no position on whether the City's

---

[4] Finding these elements unsatisfied, the Court does not address likelihood of success on the merits.
[5] Plaintiffs' ability to this challenge the City's position in this forum is subject to the City's motion to dismiss, (ECF No. 51), which the Court does not presently address.

determination that the Property is in violation of the zoning ordinances causes Plaintiffs' harm but merely that recording the notice of violation, itself, does not.

Second, the scales no longer tip in Plaintiffs' favor. The City has a recognizable interest in protecting the public from purchasing a property burdened by an alleged zoning ordinance violation without notice and there is no countervailing burden to Plaintiffs.

Last, granting this injunction would not be in the public interest. As mentioned above, the notice will alert potential buyers to an alleged issue with the Property. Preventing further future harms is in the public interest.

As Plaintiffs fail to prove these three elements—that Plaintiffs would suffer an irreparable injury in the absence of a preliminary injunction, that the balance of hardships tips in their favor, and that the injunction would be in the public interest—the Court denies the motion.

### CONCLUSION

IT IS HEREBY ORDERED that Plaintiffs' Motion for a Preliminary Injunction (ECF No. 20) is DENIED.

Dated August 25, 2020.

_____
ROBERT C. JONES
United States District Judge